UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JEFFREY NADEL, individually and on behalf of all others similarly situated,

    Plaintiff,

    v.                                          Case No: 9:25-cv-80993

PRIMO WATER CORPORATION, a Delaware corporation;
PRIMO WATER NORTH AMERICA, INC., a Delaware corporation;
and MOUNTAIN VALLEY SPRING COMPANY, LLC,
an Arkansas limited liability company,

    Defendants.                              CLASS ACTION COMPLAINT
                                             DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This case exposes a fundamental consumer fraud: Defendants market Mountain Valley Spring Water as "America's Premium Spring Water" and "the very best bottled water you can drink," charging consumers 4-8 times the price of standard bottled water based on explicit promises of exceptional purity – yet independent testing reveals their water contains multiple carcinogens that the EPA says should not be present at any level.

2.     Plaintiff Jeffrey Nadel, individually and on behalf of all others similarly situated, brings this class action against Defendants Primo Water Corporation, Primo Water North America, Inc., and Mountain Valley Spring Company, LLC (collectively "Defendants" or "Mountain Valley") for their deceptive, unfair, and unlawful business practices in connection with the marketing, distribution, and sale of Mountain Valley Spring Water products.

3.     Defendants market Mountain Valley Spring Water as "America's Premium Spring Water" and explicitly claim it is "the very best bottled water you can drink," commanding premium prices of $2-$4 per liter – 4-8 times the cost of standard bottled water. These premium prices are

justified through repeated claims of "purely sourced" water that is "free of pollutants" and "exceptionally healthful," with Defendants emphasizing their water's "3,500-year natural filtration" through "layers of quartz and Ordovician marble." *See, e.g.*, Exhibit A (list of Mountain Valley Statements).

4.      The truth is starkly different. Independent laboratory testing in July 2025 (attached as Exhibit B) of Mountain Valley's water detected arsenic, uranium, and bromoform – all substances with EPA Maximum Contaminant Level Goals of zero, meaning there is no safe level for human consumption.[1] U.S. Envtl. Prot. Agency, National Primary Drinking Water Regulations (last updated Dec. 12, 2024), https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (last visited Aug. 11, 2025) (listing MCLGs for trihalomethanes, including bromoform); 40 C.F.R. § 141.51 (2025) (MCLG for arsenic is zero); 40 C.F.R. § 141.55 (2025) (MCLG for uranium is zero); U.S. Envtl. Prot. Agency, How EPA Regulates Drinking Water Contaminants (Sept. 2018), https://www.epa.gov/sdwa/how-epa-regulates-drinking-water-contaminants (last visited Aug. 11, 2025).

5.      The independent laboratory testing conducted in July 2025 reveals that Mountain Valley Spring Water contains multiple contaminants for which the EPA has established Maximum Contaminant Level Goals. The detected contaminants include arsenic (0.16 µg/L), uranium (0.21 µg/L), and bromoform/trihalomethanes (0.15 µg/L) – all substances that the EPA has determined should ideally not be present in drinking water at any level due to their carcinogenic properties.

6.      Additionally, cadmium was detected at 0.08 µg/L, which is twice California's Public Health Goal of 0.04 µg/L. While below the EPA's MCLG and MCL of 5 µg/L, the detected level of cadmium exceeds California's stricter Public Health Goal (PHG) of 0.04 µg/L. In a

---

[1] While detected levels are below FDA MCLs, they exceed EPA MCLGs of zero and reasonable consumer expectations for a product marketed as additive-free at 4-8x standard prices.

premium water context, consumers justifiably expect water that does not run afoul of any safety thresholds promulgated by the government. *See* Agency for Toxic Substances & Disease Registry, U.S. Dep't of Health & Hum. Servs., Toxicological Profile for Cadmium (Sept. 2012), https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf (last visited Aug. 11, 2025).

7.      The presence of bromoform, a chlorination byproduct, is particularly damning: this chemical forms when chlorine disinfectants contact organic matter, likely proving that Mountain Valley's water does not achieve its qualities through "Mother Nature" alone as advertised.  Upon information and belief, either Mountain Valley is deliberately using chlorine to treat the water, or Mountain Valley is causing or allowing for external contamination during the processing of the water.

8.      Whatever its origin, bromoform's presence, as confirmed by EPA guidance, indicates likely undisclosed, chlorine-based treatment, contradicting Defendants' disclosed ozonation/UV processes (which produce bromate, not bromoform).  *See* U.S. Envtl. Prot. Agency, Stage 1 and Stage 2 Disinfectants and Disinfection Byproducts Rules (last updated July 1, 2025), https://www.epa.gov/dwreginfo/stage-1-and-stage-2-disinfectants-and-disinfection-byproducts-rules (last visited Aug. 11, 2025); U.S. Envtl. Prot. Agency, Disinfectants and Disinfection Byproducts Rules: Plain English Guide (June 2020), https://www.epa.gov/sites/default/files/2020-06/documents/dbpr_plain _english_guide_final_508.pdf (last visited Aug. 11, 2025); Philip C. Singer, Control of Disinfection By-Products in Drinking Water, J. Env't Eng'g, July-Aug. 1994, at 727; *see also* U.S. Envtl. Prot. Agency, Alternative Disinfectants and Oxidants Guidance Manual (Apr. 1999), https://nepis.epa.gov/Exe/ZyPDF.cgi/2000219L.PDF?Dockey=2000219L.PDF (last visited Aug. 11, 2025); Philip C. Singer, Formation and Control of Disinfection By-Products in Drinking Water (Am. Water Works Ass'n 1999).

9.       Tellingly, Defendants may have known the truth all along and concealed it. In May 2025, Mountain Valley experienced a sudden, major supply shortage affecting nationwide distribution. This shortage mysteriously coincided with viral TikTok videos and social media posts independently testing the water and exposing contamination. The suspicious timing suggests Defendants may have voluntarily restricted distribution to manage the crisis while maintaining their premium pricing and "purely sourced" marketing claims – choosing to deceive remaining customers rather than admit the truth about their water.

10.       Even more troubling, Defendants may have manipulated their public disclosures or strategically decided to stop releasing lab reports to conceal the contamination they knew about. Their own 2023 Water Quality Report (Exhibit C) – the last one they published – claims "ND" (not detected) for the exact contaminants found in 2025 testing. Meanwhile, independent analysis by the Oasis Health App in 2025, which ranks tests from over 600 bottled waters, ranks Mountain Valley at 55/100 – in the bottom 25% of all brands tested.

11.       Remarkably, Defendants' own budget brand, Primo Spring Water, scores 68/100, proving Defendants *can* produce cleaner water but choose not to for their "premium" product.

12.       The premium bottled water market, in which Mountain Valley competes, is characterized by explicit purity differentiation. Consumers in this market pay substantial premiums specifically to avoid contaminants present in tap water or standard bottled water. Premium bottled water commands price premiums of 300-500% based primarily on purity claims.

13.       This lawsuit seeks to hold Defendants accountable for their deception. *See* Exhibit D (various health-related issues). Health-conscious consumers, including Plaintiff Jeffrey Nadel, paid substantial premiums believing they were purchasing "the very best bottled water you can drink" – water that was "purely sourced" and achieved through natural processes without additives.

14.     Instead, they received water containing detectable carcinogens and disinfection byproducts that Walmart's distilled water, at one-quarter the price, does not contain.

15.     Through this action, Plaintiff seeks to recover the premium prices consumers paid based on Defendants' false promises and to enjoin Defendants from continuing to deceive the public about the true nature of their water.

## PARTIES

16.     Plaintiff Jeffrey Nadel is a citizen of Florida who resides in Palm Beach County, Florida. During the Class Period, Mr. Nadel regularly purchased Mountain Valley Spring Water 1-liter glass bottles, 16.9 fl oz glass bottles, and 25.36 fl oz aluminum bottles from retail locations including Whole Foods Market, The Fresh Market, and Sprouts Farmers Market in Palm Beach County, Florida from at least 2024 through 2025. Mr. Nadel specifically relied on Defendants' marketing claims that Mountain Valley was "purely sourced," "the very best bottled water you can drink," and "free of pollutants," as displayed on packaging, websites, and retail displays – this marketing scheme created a pervasive perception of pure, clean, and healthy water. Mr. Nadel paid premium prices of $2.50-$4.00 per liter based on these representations. Had Mr. Nadel known the water contained detectable levels of contaminants with EPA health goals of zero, including carcinogens and disinfection byproducts, he would not have purchased the products or would have paid no more than standard bottled water prices. Mr. Nadel routinely purchases bottled spring water for home use, including for his daughter and family, and intends to continue purchasing Mountain Valley Spring Water if it is truthfully labeled and conforms to its advertised attributes. Mr. Nadel regularly shops at stores where Mountain Valley is sold and faces imminent risk of future harm because he cannot rely on Defendants' current labeling absent injunctive relief requiring accurate disclosure.

17.     Mr. Nadel purchased Mountain Valley Spring water from Whole Foods Market, The Fresh Market, and Sprouts Farmers Market locations in Palm Beach County on many occasions throughout 2024 and 2025, including on April 6, 2024, May 15, 2025, and July 11, 2025. In each case, Mr. Nadel based his purchase decision on labels claiming "no additives whatsoever" and website/blog posts dated June 7, 2023, asserting, "We still don't mess with additives of any kind."  Mr. Nadel faces imminent future harm, as he desires to purchase truly pure spring water, regularly shops where Mountain Valley is sold, and cannot determine from current labeling whether the water contains undisclosed contaminants. He would immediately resume purchasing Mountain Valley if it were reformulated to match its marketing claims.

18.     Defendant Primo Water Corporation is a Delaware corporation, publicly traded on the NYSE under ticker symbol PRMW, with its principal place of business in Tampa, Florida. Primo Water Corporation (formerly Cott Corporation) acquired Mountain Valley Spring Company in 2018 for approximately $78.5 million and is responsible for the distribution, marketing, quality control, and consumer communications for Mountain Valley Spring Water products.

19.     Defendant Primo Water North America, Inc. (f/k/a DS Services of America, Inc.) is a Delaware corporation and operating subsidiary of Primo Water Corporation that directly manages bottling operations, quality control standards, and distribution of Mountain Valley Spring Water throughout the United States, doing business as "Mountain Valley Spring Water."

20.     Defendant Mountain Valley Spring Company, LLC is an Arkansas limited liability company that sources Mountain Valley Spring Water from springs in the Ouachita Mountains.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the Class exceeds 100 members, the amount in controversy exceeds

$5,000,000 exclusive of interest and costs, based on millions of units sold annually at premium prices, and this is a class action in which members of the proposed Class are citizens of states different from Defendants.

22.     This Court has personal jurisdiction over Defendants because Primo Water Corporation maintains its principal place of business in Florida, regularly conducts substantial business in Florida, and has sufficient minimum contacts with Florida.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred here, including Plaintiff's purchases and exposure to Defendants' representations at retail stores in Palm Beach County; and Defendants transact substantial business in this District. Defendants maintain principal places of business in Florida (Tampa) and Connecticut

24.     Upon information and belief, this is the first filed class action regarding Mountain Valley Spring Water's concealed contamination and deceptive "no additives" marketing. As the first filed action, this Court is entitled to leadership in any consolidated proceedings should related cases be filed, and judicial economy favors maintaining this action in this District.

## FACTUAL ALLEGATIONS

### A. Mountain Valley's Premium Marketing Representations

25.     Mountain Valley Spring Water is marketed as an ultra-premium bottled water product through Defendants' website, product packaging, retail displays, and advertising. Central to this premium positioning are explicit claims of exceptional purity and quality that justify prices 4-8 times higher than standard bottled water. In their June 7, 2023 blog post titled "Best Bottled Water: Why Mountain Valley Spring Water is the Clear Winner," Defendants make numerous explicit representations, including:

a. "For the very best bottled water, look no further than the award-winning, naturally mineralized refreshment of Mountain Valley Spring Water"

b. "Mountain Valley Spring Water is the very best bottled water you can drink"

c. "our purely sourced spring water still flows naturally from that same protected Ouachita Mountains spring"

d. "We still don't mess with additives of any kind"

e. "That water fell from the skies some 3,500 years ago as rain and snow"

f. "filtered into granite-based aquifers and then back to the surface . . . through layers of limestone, quartz and Ordovician marble"

g. "These things don't simply make Mountain Valley Spring Water deliciously easy to drink, they make our water exceptionally healthful and wonderfully hydrating, too"

h. "Mountain Valley Spring Water comes by its purely award-winning taste the old fashioned way: Mother Nature"

26.     Defendants make specific, verifiable promises about their water's purity that go beyond mere puffery. On their website's "Water Quality Matters" blog post and product pages throughout the class period, Defendants explicitly state: "no additives, chemicals, preservatives or colorants" and "no additives whatsoever." They further claim "what you see is what you get" and market their water as "water as nature intended." These are not subjective quality claims. They are specific factual representations that the water contains nothing added during processing – representations that ordinary consumers would understand to mean that no processing agents, sanitizers, or their byproducts are present.

27.     Defendants' representations transcend mere puffery because they include specific, measurable claims (among others): "no additives whatsoever" is a verifiable statement of fact –

either additives/byproducts are present or they are not. Similarly, water that "still flows naturally" and achieves its qualities through "Mother Nature" alone makes factual claims about the absence of human processing that the presence of chlorination byproducts definitively disproves.

28.     Defendants prominently advertise their accolades and superiority over competitors. In the same June 2023 blog post, they claim to have been "presented Mountain Valley Spring Water with 19 honors, making us America's most award-winning spring water" from the Berkeley Springs International Water Tasting, which they describe as "the veritable Academy Awards of Water." They explicitly state their water has been ranked "Best Bottled Spring Water" and note that "Mountain Valley's full range of products are regularly ranked among the best not only in the United States, but also the world." Defendants further claim that multiple publications ranked Mountain Valley as "No. 1 best bottled water," with Thrillist quoted as saying their water "Tastes like it's been filtered through a geological treasure. Rich and luxurious mouthfeel."

29.     Defendants make specific representations about their source protection and water purity that form the basis of their premium pricing. In their June 2023 blog post, they claim: "Our source is surrounded by 2,000 verdant acres of protected forest" and "Since 1871, we've worked hard to preserve this unique spring, its land, and the water that flows beneath it." They assert that their water undergoes a natural filtration process that "cannot be replicated in a factory" and emphasize: "While some bottled-water companies add minerals and bases to their waters to try and achieve a balance of flavor and pH, Mountain Valley Spring Water comes by its purely award-winning taste the old fashioned way: Mother Nature." These statements explicitly position Mountain Valley as superior to competitors precisely because of its claimed natural purity without any additives or treatment.

30.     In this premium segment, specific terminology carries defined meaning. Industry practice and consumer understanding establish that "spring water" means water from an underground source flowing naturally to the surface, "naturally filtered" means no mechanical or chemical filtration, and "no additives" means no chemicals added during processing. These are terms of art, not mere marketing puffery.

31.     The premium bottled water market is distinct from the commodity bottled water market. Premium bottled waters command prices above $2.00 per liter based primarily on three factors: (1) source uniqueness/purity, (2) mineral content claims, and (3) heritage/provenance.

32.     Defendants specifically market health benefits, claiming their water contains "wholesome goodness trace minerals, such as calcium, magnesium and potassium" with a "naturally alkaline pH of 7.3 to 7.7." They state these attributes "make our water exceptionally healthful and wonderfully hydrating, too." They further claim to be "the oldest bottled water poured across the U.S." since 1871, stating "little has changed" and "We still bottle in 100% recyclable glass." These products are sold at premium prices of $2.50-$4.00 per 1-liter glass bottle, with Defendants explicitly justifying these prices based on their water being "the very best bottled water" available.

**B.  FDA Regulatory Framework and Consumer Understanding**

33.     This case challenges false advertising, not FDA-compliant sanitation. Plaintiff does not allege that Defendants violated FDA's bottled-water Current Good Manufacturing Practices ("CGMPs") or quality standards. To the contrary, FDA permits bottled-water plants to sanitize with chlorine-equivalent agents or ozone (21 C.F.R. § 129.80(d)) and regulates bottled-water disinfection byproducts including TTHMs (80 µg/L) and bromate (10 µg/L) in 21 C.F.R. § 165.110.

34.     The deception arises because Defendants affirmatively market Mountain Valley as containing "no additives whatsoever" and proclaiming that Mountain Valley does not "mess with additives of any kind," representations that a reasonable consumer would understand to exclude contact with chlorine-equivalent sanitizers and their chemical byproducts. Plaintiff's claims therefore parallel federal law and do not seek to impose any non-identical labeling requirement.

35.     These extensive marketing representations create specific consumer expectations. When Defendants claim their water "still flows naturally" from a protected spring without additives, has been filtered through geological formations for 3,500 years, and represents "the very best bottled water you can drink," consumers reasonably expect water that is free from man-made contaminants and contains, at most, only naturally occurring minerals at safe levels. The premium price of $2.50-$4.00 per liter – compared to $0.50-$1.00 for standard bottled water – is justified solely by these purity representations.

36.     Under FDA regulations governing bottled water, plants may use safe and suitable antimicrobial agents – including chlorine-equivalent solutions or ozone – for processing and equipment sanitization. 21 C.F.R. § 129.80(d) (2025). FDA's quality standards specifically regulate disinfection byproducts, including total trihalomethanes ("TTHMs") and bromate, which can form during standard treatment and bottling processes. 21 C.F.R. § 165.110(b) (2025).  FDA's CGMPs specifically require bottled water facilities to test for disinfection byproducts including total trihalomethanes ("TTHMs") and bromate precisely because these substances can form during standard water treatment and bottling processes.

37.     Ordinary consumers are unaware of these processing allowances. When Defendants claim their water contains "no additives whatsoever" and "no additives, chemicals, preservatives or colorants," a reasonable consumer would believe nothing has been added during processing and

no chemical byproducts are present. This is particularly misleading because FDA regulations specifically contemplate and allow the very processing agents and byproducts that Defendants claim are absent. A reasonable consumer reading "We still don't mess with additives of any kind" would not understand this to mean "we use FDA-approved antimicrobial agents that may leave chemical byproducts."

38.     While Mountain Valley's contamination levels remain below FDA's enforceable Maximum Contaminant Levels, Defendants' marketing claims are absolute, not relative. When Defendants promise "no additives whatsoever" and water achieving its qualities through "Mother Nature" alone, reasonable consumers expect zero artificial processing or resulting byproducts – not merely FDA-compliant levels.

39.     This is particularly true given the 4-8x price premium over waters that explicitly disclose treatment.

**C.  The Reality: Detectable Contaminants with Zero Health Goals**

40.     Contrary to Defendants' representations of exceptional purity, independent laboratory testing conducted in July 2025 on Mountain Valley 5-Gallon Glass products reveals the presence of multiple contaminants for which the EPA has established Maximum Contaminant Level Goals of zero:[2]

**i.  Contaminants with MCLG = 0 (*i.e.*, EPA's health-based goal is zero):**

a.   Arsenic: 0.16 µg/L detected (MCLG: 0; MCL: 10 µg/L)

b.   Bromoform (a trihalomethane): 0.15 µg/L detected (MCLG: 0 for several THMs; MCL: 80 µg/L)

c.   Uranium: 0.21 µg/L detected (MCLG: 0; MCL: 30 µg/L)

---

[2] These claims remain live on defendants'' website as of August 2025, despite no water quality updates since 2023.

**ii. Contaminants exceeding strict state health goals:**

a. Cadmium: 0.08 µg/L detected (twice California's Public Health Goal of 0.04 µg/L; EPA MCL: 5 µg/L) (California's PHG is stricter than the federal MCL to account for long-term exposure risks like kidney damage and bone effects from cadmium).

41.     Laboratory analyses detected nitrate (as nitrogen) at 0.20 mg/L. While this concentration is far below the EPA's enforceable Maximum Contaminant Level ("MCL") of 10 mg/L for nitrate in drinking water, the detection confirms the presence of nitrogen compounds consistent with agricultural, industrial, or natural mineral sources. The U.S. Environmental Protection Agency notes that elevated nitrate levels can pose serious health risks to infants – particularly methemoglobinemia ("blue baby syndrome") – when concentrations approach or exceed the health-protective standard. See 40 C.F.R. § 141.62(b) (2025), https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-141/subpart-G/section-141.62; U.S. Envtl. Prot. Agency, National Primary Drinking Water Regulations (last updated Mar. 2023), https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations; U.S. Envtl. Prot. Agency, What Are the Possible Health Effects of Nitrate Exposure? (last updated Jan. 9, 2024), https://www.epa.gov/mn/what-are-possible-health-effects-nitrate-exposure.

42.     Testing also detected barium at 0.013–0.02 mg/L and fluoride at 0.15–0.20 mg/L. Although these levels are well below the EPA's enforceable limits (barium MCL = 2 mg/L; fluoride MCL = 4 mg/L), barium is associated with cardiovascular effects (such as hypertension) at elevated exposures near or above the MCL. See 40 C.F.R. § 141.62(b) (2025), https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-141/subpart-G/section-141.62; U.S. Envtl. Prot. Agency, Consumer Factsheet on: Barium (Sept. 2016), https://www.epa.gov/sites/default/files/2016-09/documents/barium.pdf. Fluoride at these concentrations is consistent

with naturally occurring levels in regional groundwater (e.g., medians of 0.2–0.48 mg/L in the Ozark Aquifer) and does not, standing alone, establish the use of added fluoride, though consumers expecting "no additives whatsoever" anticipate their water to be fluoride-free – a hotly debated health topic in both national media and government policy discussions.

43.     In addition to detectable uranium – a naturally occurring radioactive element with an EPA MCL goal of zero – consumers have reported visible particles in Mountain Valley products in 2024, with some describing throat irritation and gastrointestinal distress. *See* 40 C.F.R. § 141.66(b) (2025) (uranium MCL = 30 µg/L; MCLG = 0). Such reports suggest potential batch-to-batch quality variations that Defendants have failed to address, investigate, or disclose to consumers paying premium prices for consistent purity.

44.     The EPA defines MCLGs as non-enforceable public health goals set "at a level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." 40 C.F.R. § 141.2 (2025). MCLs are the enforceable limits set "as close to the maximum contaminant level goal as is feasible." *Id.* For arsenic and uranium, the MCLGs are 0, with MCLs of 10 µg/L and 30 µg/L, respectively. 40 C.F.R. §§ 141.62(b) (arsenic), 141.66(b) (uranium) (2025). For trihalomethanes, including bromoform, EPA sets an MCL of 80 µg/L for total THMs, 40 C.F.R. § 141.64(b) (2025), and individual MCLGs for each compound; the MCLG for bromoform is 0. *See* U.S. Envtl. Prot. Agency, *Bromoform* 1 (Sept. 2016), https://www.epa.gov/sites/default/files/2016-09/documents/bromoform.pdf (last visited Aug. 11, 2025).

45.     The EPA has established MCLGs of zero for arsenic (despite an enforceable MCL of 10 µg/L), lead (despite an action level of 15 µg/L), bromoform and other trihalomethanes (despite an MCL of 80 µg/L for total trihalomethanes), and uranium (despite an MCL of 30 µg/L).

See 40 C.F.R. §§ 141.62(b) (arsenic), 141.80(c) (lead), 141.64(b) (THMs), 141.66(b) (uranium) (2025). As explained in the Federal Register and EPA guidance, an MCLG of zero reflects a health-protective target of complete absence of the contaminant. "ND" ("non-detect") – as Defendants disclosed in their last publicly released 2023 water quality report – does not mean zero risk, particularly where the EPA's health goals for these carcinogens are literally zero. *See* 40 C.F.R. § 141.2 (definition of MCLG); U.S. Envtl. Prot. Agency, National Primary Drinking Water Regulations,   https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (last visited Aug. 11, 2025).

46.     While the detected levels in Mountain Valley Spring Water remain below the enforceable Maximum Contaminant Levels, the presence of any toxic metals – *e.g.*, cadmium at 0.08 µg/L (double California's Public Health Goal of 0.04 µg/L; EPA MCLG and MCL = 5 µg/L) – directly contradicts Defendants' explicit claims that their water is "the very best bottled water you can drink" and comes by its purity "the old fashioned way: Mother Nature." *See Office of Envtl. Health Hazard Assessment*, *Public Health Goal for Cadmium in Drinking Water* 1 (Dec. 19, 2006),

47.     The health implications of these detections are well documented in peer-reviewed literature and government health assessments. According to the Agency for Toxic Substances and Disease Registry ("ATSDR") and the EPA toxicological profiles, chronic arsenic exposure – even at low levels – has been associated with increased risks of bladder, lung, and skin cancers, cardiovascular disease, and adverse pregnancy outcomes including low birth weight and neurodevelopmental effects. *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Arsenic* (Aug. 2007), https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf (last visited Aug. 11, 2025); U.S. Envtl. Prot. Agency, *Integrated Risk Information System: Arsenic, Inorganic*,

https://iris.epa.gov/ChemicalLanding/&substance_nmbr=0278 (last visited Aug. 11, 2025). Uranium's primary health concern is nephrotoxicity (kidney damage), with the EPA establishing an MCLG of zero due to its combined chemical and radiological toxicity. *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Uranium* (Feb. 2013), https://www.atsdr.cdc.gov/toxprofiles/tp150.pdf (last visited Aug. 11, 2025); 40 C.F.R. § 141.66(b) (2025). Bromoform and other trihalomethanes are epidemiologically associated with increased bladder cancer risk in recent studies and with liver and kidney effects in toxicological assessments, with several studies reporting elevated risks even at concentrations below the EPA's 80 µg/L MCL for total trihalomethanes.[3] Cadmium causes kidney toxicity and bone demineralization, with California's Public Health Goal of 0.04 µg/L – half of Mountain Valley's detected level of 0.08 µg/L (*see* Lab Report, July 2025, Exhibit B) – reflecting current science on long-term risks even at low levels. *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Cadmium* (Sept. 2012), https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf (last visited Aug. 11, 2025); Cal. Off. of Envtl. Health Hazard Assessment, *Public Health Goal for Cadmium in Drinking Water* 1–3 (Dec. 2006), https://oehha.ca.gov/sites/default/files /media/downloads /water/chemicals/122206cadmiummemo.pdf (last visited Aug. 11, 2025). These documented health risks make Defendants' marketing of their water as "exceptionally healthful" particularly misleading.

---

[3] The Evlampidou meta-analysis reviewed bladder cancer incidence data across 26 epidemiological studies from multiple EU countries, correlating case-control and cohort study outcomes with measured total trihalomethane ("TTHM") levels in public drinking water systems. The pooled analysis found statistically significant increased bladder cancer risk in populations exposed to mean TTHM concentrations as low as 10–50 µg/L – well below the U.S. Environmental Protection Agency's enforceable limit of 80 µg/L. The authors concluded that bladder cancer risk rises in a dose–response manner with TTHM exposure, and that current regulatory limits may not be fully protective. *See, e.g.*, Ioanna Evlampidou et al., *Trihalomethanes in Drinking Water and Bladder Cancer Burden in the European Union*, 128 *Envtl. Health Persp.* 017001-1, 017001-7 to -9 (2020), https://doi.org/10.1289/EHP4495 (last visited Aug. 11, 2025).

48.     Bromoform and other THMs are associated with increased bladder cancer risk, and recent epidemiological studies have reported elevated risks even at concentrations below the EPA enforceable limit of 80 µg/L for total THMs. *See, e.g.*, Ioanna Evlampidou et al., *Trihalomethanes in Drinking Water and Bladder Cancer Burden in the European Union*, 128 *Envtl. Health Persp.* 017001-1, 017001-7 to -9 (2020), https://doi.org/10.1289/EHP4495 (last visited Aug. 11, 2025). Cadmium causes kidney toxicity and bone demineralization, and California's Public Health Goal ("PHG") of 0.04 µg/L – half of Mountain Valley's detected level of 0.08 µg/L – reflects the current toxicological consensus on long-term health risks. *See* Cal. Off. of Envtl. Health Hazard Assessment, *Public Health Goal for Cadmium in Drinking Water* 1–3 (Dec. 19, 2006), https://oehha.ca.gov/sites/default/files/media/downloads/water/chemicals/122206cadmiummemo .pdf (last visited Aug. 11, 2025). These documented health risks make Defendants' marketing of their water as "exceptionally healthful" particularly unsound.

**D.  Potential Sources of Contamination**

49.     Plaintiff does not contend that any specific third-party facility or activity is the definitive source of the contaminants detected in Mountain Valley Spring Water.

50.     This case is about false marketing, not negligence or nuisance: regardless of origin, Defendants uniformly promote their product as "purely sourced" and containing "no additives whatsoever," yet independent third-party testing found bromoform – a chlorination byproduct – and other constituents for which the EPA has set MCLGs of zero. *See* U.S. Envtl. Prot. Agency, *Bromoform* 1 (Sept. 2016), https://www.epa.gov/sites/default/files/2016-09/documents/ bromoform.pdf (last visited Aug. 11, 2025) (explaining that bromoform forms when chlorine reacts with naturally occurring bromide and organic matter during disinfection and listing its MCLG as zero); 40 C.F.R. § 141.64(b) (2025) (establishing an MCL of 0.080 mg/L for total trihalomethanes

and an MCLG of zero for bromoform); 40 C.F.R. §§ 141.62(b), 141.66(b) (2025) (MCLGs of zero for arsenic and uranium). The existence of nearby mining, waste management, and industrial facilities capable of introducing precursors or contaminants into the aquifer underscores the implausibility of Defendants' "protected" source narrative, but Plaintiff's claims do not depend on proving a particular pathway – only that Defendants misrepresented the purity, treatment, and "protection" of their product.

51.     <u>Mining Operations with Documented Contamination Potential</u>:

a.   Ron Coleman Mining, located at 5199 AR-7, Jessieville, Arkansas – an active quartz mining operation approximately 14.5 miles from the Mountain Valley spring that disturbs novaculite bedrock associated with trace arsenic (*see* Ron Coleman Mining, https://roncolemanmining.com (last visited Aug. 11, 2025));

b.   Wegner Quartz Crystal Mines, 82 Wegner Road, Mount Ida, Arkansas – approximately 30 miles from the spring (*see* Wegner Quartz Crystal Mines, https://wegnercrystalmines.com (last visited Aug. 11, 2025));

c.   Avant Mining/Fisher Mountain, Mount Ida, Arkansas – approximately 31 miles from the spring (*see* Avant Mining, https://avantmining.com (last visited Aug. 11, 2025)).

52.     These mining operations disturb geological formations containing naturally occurring arsenic, uranium, and other minerals that can be potentially mobilized through erosion, runoff, or groundwater movement into the regional aquifer system. *See, e.g.*, Ark. Geological Survey, *Novaculite*, https://www.geology.arkansas.gov/minerals/novaculite.html (last visited Aug. 11, 2025) (describing novaculite bedrock in the Ouachita Mountains); U.S. Geological Survey, *Geohydrology and Water Quality of the Ouachita Mountains Aquifer in Arkansas*, U.S. Geological Survey Sci. Investigations Rep. 2014-5149 (2014), https://pubs.usgs.gov/sir/2014/5149/pdf

/sir2014-5149s.pdf (last visited Aug. 11, 2025) (explaining fracture-controlled flow in novaculite formations and vulnerability to contaminant transport); *see also* U.S. Geological Survey, *Geology of the De Queen and Caddo Gap Quadrangles, Arkansas*, U.S. Geological Survey Bull. 808, at 151–52 (1917), https://pubs.usgs.gov/bul/0808/report.pdf (last visited Aug. 11, 2025) (noting trace arsenic in antimony deposits associated with quartz veins).

53.  Waste Management Facilities Near the Spring:

a.  **Hot Springs Solid Waste Transfer Station – located approximately 2.5 miles from Mountain Valley's bottling facility** (*see* City of Hot Springs, *Solid Waste Transfer Station*, https://www.cityhs.net/323/Solid-Waste (last visited Aug. 11, 2025));

54.  Garland County Landfill, 2085 Mountain Pine Road, Hot Springs, Arkansas – approximately 8 miles from the spring (*see* Garland County, Ark., *Solid Waste Department*, https://www.garlandcounty.org/293/Solid-Waste (last visited Aug. 11, 2025)).

55.  These facilities may represent potential sources of organic matter that, when entering water systems via leachate or runoff, serve as precursors for disinfection byproduct formation during chlorination or ozonation, despite regulatory controls like liners intended to minimize groundwater impacts. *See* U.S. Envtl. Prot. Agency, *Disinfection Byproducts in Drinking Water*, https://www.epa.gov/dwreginfo/disinfection-byproducts-drinking-water (last visited Aug. 11, 2025) (explaining that natural organic matter from decaying vegetation and waste is the major precursor for trihalomethanes and haloacetic acids); *see also* U.S. Envtl. Prot. Agency, *Municipal Solid Waste Landfills*, https://www.epa.gov/landfills/municipal-solid-waste-landfills (last visited Aug. 11, 2025) (noting that MSW landfills produce leachate containing organic compounds, despite controls such as liners); *cf.* U.S. Envtl. Prot. Agency, *Bromate* 1 (Sept. 2016), https://www.epa.gov/sites/default/files/2016-09/documents/bromate.pdf  (last  visited  Aug.  11,

2025) (noting that bromate can form during ozonation of water containing bromide, a process sometimes used in bottled water treatment). The proximity of the transfer station – only 2.5 miles from the bottling facility – is particularly concerning given Mountain Valley's claims of a "protected" water source.

56.   <u>Industrial Facilities with Environmental Compliance Issues</u>:

a.   U.S. Vanadium LLC – located approximately 4.8 miles from the Mountain Valley spring, this facility has been subject to Arkansas Department of Energy & Environment ("ADEQ") discharge complaints and reports annual chemical releases to EPA's Toxics Release Inventory. *See* U.S. Envtl. Prot. Agency, Toxics Release Inventory Facility Profile: U.S. Vanadium LLC (TRI ID: 71913THGNT1VANA),  https://enviro.epa.gov/enviro/tris_details_v3.view?fac_id=71913THGN T1VANA (last visited Aug. 11, 2025) (reporting releases of vanadium compounds and ammonia); Ark. Dep't of Energy & Env't, Enforcement Actions, https://www.adeq.state.ar.us/enforcement/ (last visited Aug. 11, 2025) (listing enforcement actions and complaints).

b.   Lake Catherine Power Plant – located approximately 17 miles from the spring, a coal- and natural gas-fired generating station with documented wastewater discharges regulated under the Clean Water Act. *See* Entergy Ark., Lake Catherine Plant, https://www.entergy-arkansas.com/your_business/lake_catherine.aspx (last visited Aug. 11, 2025); U.S. Envtl. Prot. Agency, ECHO Detailed Facility Report: Lake Catherine Plant (NPDES ID: AR0035807), https://echo.epa.gov/detailed-facility-report?fid=110000561219 (last visited Aug. 11, 2025) (detailing permitted discharges).

c.   Mountain Pine Pressure Treating – located approximately 10 miles from the spring, an EPA National Priorities List (Superfund) site since 1999 with documented arsenic contamination in groundwater from historical wood-treatment operations. *See* U.S. Envtl. Prot.

Agency, Superfund Site Profile: Mountain Pine Pressure Treating (EPA ID: ARD042755986), https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0601381 (last visited Aug. 11, 2025) (noting arsenic in site groundwater and ongoing cleanup).

      d.  Arkansas Nuclear One – located approximately 50 miles from the spring, the state's only nuclear power facility, which experienced a documented radioactive water leak in 1989. *See* U.S. Nuclear Regulatory Comm'n, Arkansas Nuclear One Facility Information, https://www.nrc.gov/info-finder/reactors/ano1.html (last visited Aug. 11, 2025); U.S. Nuclear Regulatory Comm'n, Event Notification Report 16829 (Feb. 16, 1989), https://www.nrc.gov/reading-rm/doc-collections/event-status/event/1989/19890216en.html (last visited Aug. 11, 2025) (documenting historical radioactive water leak from spent fuel pool).

57.    These facilities may represent potential sources of chemical, metal, or radiological contaminants that, through permitted or accidental discharges, could enter the watershed or regional aquifer system supplying Mountain Valley's spring. The proximity of such industrial operations – some within 5 miles – is inconsistent with Defendants' marketing of their source as "protected" and "untouched by industry."

***

58.    While some trace contaminants may occur naturally from the geological formations Defendants tout in their marketing, the presence of disinfection byproducts like bromoform definitively proves human treatment processes. Moreover, Defendants' failure to disclose either the natural contamination potential of their geological source or the numerous industrial facilities in proximity to their "protected" spring constitutes deception of consumers paying premium prices for water marketed as achieving its qualities through "Mother Nature" alone.

59.     The detection of bromoform in Mountain Valley's finished products is scientifically significant and directly contradicts Defendants' treatment claims. According to the EPA's guidance and peer-reviewed scientific literature, trihalomethanes, including bromoform, form specifically when chlorine-based disinfectants react with natural organic matter and bromide in water – they are chlorination byproducts. Chronic exposure to bromoform has been associated in toxicological assessments with liver and kidney effects, and recent epidemiological evidence suggests increased bladder cancer risk from THMs, including bromoform, even at concentrations below the EPA's 80 µg/L MCL for total THMs.[4]

60.     Critically, the treatment methods Defendants claim to use cannot produce bromoform: (1) ozonation, which Defendants acknowledge using, produces bromate when bromide is present – not bromoform; and (2) ultraviolet ("UV") disinfection does not produce any THMs.

61.     According to the U.S. Environmental Protection Agency's Stage 2 Disinfectants and Disinfection Byproducts Rule, 71 Fed. Reg. 388, 391–92 (Jan. 4, 2006), and peer-reviewed literature, bromoform forms primarily through the halogenation reaction between chlorine-based disinfectants and naturally occurring bromide and organic matter.[5] Common alternative bottled-

---

[4] The Evlampidou meta-analysis reviewed bladder cancer incidence data across 26 epidemiological studies from multiple EU countries, correlating case-control and cohort study outcomes with measured total trihalomethane levels in public drinking water systems. The pooled analysis found statistically significant increased bladder cancer risk in populations exposed to mean TTHM concentrations as low as 10–50 µg/L – well below the U.S. Environmental Protection Agency's enforceable limit of 80 µg/L. The authors concluded that bladder cancer risk rises in a dose–response manner with TTHM exposure, and that current regulatory limits may not be fully protective. *See, e.g.*, Ioanna Evlampidou et al., *Trihalomethanes in Drinking Water and Bladder Cancer Burden in the European Union*, 128 *Envtl. Health Persp.* 017001-1, 017001-7 to -9 (2020), https://doi.org/10.1289/EHP4495 (last visited Aug. 11, 2025).

[5] Singer's analysis reviews the kinetics and conditions favoring THM formation during drinking water treatment, with specific discussion of bromoform as a halogenated byproduct. The article explains that bromoform is generated predominantly when free chlorine or other chlorine-based oxidants react with naturally occurring bromide in source waters containing natural organic matter, and that reaction rates increase with higher bromide concentrations, longer contact times, and higher temperatures. *See* P.C. Singer, *Control of Disinfection By-Products in Drinking Water*, 120 *J. Envtl. Eng'g* 727, 729–30 (1994). Singer further contrasts this mechanism with ozonation, which – when bromide is present – yields bromate rather than bromoform, underscoring that bromoform formation is a signature indicator of

water treatment processes – such as ozonation or UV disinfection – do not produce bromoform, although ozonation in the presence of bromide can produce bromate, a chemically distinct contaminant regulated under 21 C.F.R. § 165.110(b) (2025). The detection of bromoform in Mountain Valley's finished products is therefore consistent with chlorine contact somewhere in the processing, bottling, or distribution chain, notwithstanding Defendants' claimed use of only UV and ozonation.

62.     Other contaminants detected in Mountain Valley products carry serious, well-documented health risks:

a.     Arsenic – Associated with increased risks of bladder, lung, and skin cancers, cardiovascular disease, and adverse pregnancy outcomes even at low levels. *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Arsenic* (Aug. 2007), https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf (last visited Aug. 11, 2025).

b.     Uranium – Primary health concern is nephrotoxicity (kidney damage), and the EPA has set its MCLG at zero due to combined chemical and radiological toxicity. *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Uranium* (Feb. 2013), https://www.atsdr.cdc.gov/toxprofiles/tp150.pdf (last visited Aug. 11, 2025).

c.     Cadmium – Causes kidney toxicity and bone demineralization, with California's Public Health Goal ("PHG") of 0.04 µg/L – half of Mountain Valley's detected level – reflecting current science on long-term risks. *See* Cal. Off. of Envtl. Health Hazard Assessment, *Public Health Goal for Cadmium in Drinking Water* 1–3 (Dec. 2006), https://oehha.ca.gov/sites/default/files/media/downloads/water/chemicals/122206cadmiummemo.pdf (last visited Aug. 11, 2025).

---

chlorine contact. The U.S. Environmental Protection Agency's fact sheet on bromoform likewise explains that it "forms when chlorine reacts with naturally occurring bromide in source water during disinfection" and lists its MCLG as zero. *See* U.S. Envtl. Prot. Agency, *Bromoform* 1 (Sept. 2016), https://www.epa.gov/sites/default/files/2016-09/documents/bromoform.pdf (last visited Aug. 11, 2025).

63.     These health risks make Defendants' marketing of their water as "exceptionally healthful" particularly misleading.

64.     This supports only two likely possible explanations: (a) Defendants use chlorine-based sanitizers despite claiming otherwise; or (b) external chlorination contamination has occurred and has been concealed. Either scenario demonstrates that Defendants' claim of "no additives of any kind" and water that "comes by its purely award-winning taste the old fashioned way: Mother Nature" is materially false.

**E. Third-Party Testing Confirmation**

65.     The presence of these contaminants is confirmed by independent third-party testing. The Oasis Health App, developed by water quality expert Cormac Hayden, has tested and rated over 600 bottled water brands based on comprehensive contamination analysis.

66.     Mountain Valley Spring Water consistently scores 55 out of 100 – ranking approximately 140th out of 600+ tested waters, placing them in the bottom 25% of all tested brands for their water health quality ranking.

67.     This objective scoring is particularly damaging given Mountain Valley's premium positioning and pricing.  The Oasis data reveals that over 130 bottled water brands score better than Mountain Valley, including:

        a.   <u>Premium competitors achieving perfect scores</u>: Hawaii  Volcanic  (100/100), Icelandic Glacial (100/100), demonstrating that high quality water is achievable

        b.   <u>Mid-tier brands significantly outperforming Mountain Valley</u>: Vellamo (97/100), Aqua Carpatica (95/100), Penta Water (95/100) – all 40+ points higher

c. <u>Budget alternatives scoring 15-20 points higher</u>: Walmart Great Value Distilled (70/100 at $0.50/liter), Kroger Purified (66/100 at $0.75/liter), Sam's Club Choice Purified (66/100 at $0.60/liter)

d. <u>Most tellingly, Defendants' own budget brand</u>: Primo Spring Water scores 68/100 – 13 points higher than Mountain Valley while selling for $1.00/liter versus Mountain Valley's $2.50-$4.00/liter

68.     This data proves Defendants have the technical capability to produce cleaner water – as demonstrated by their own Primo Spring Water scoring 13 points higher – but deliberately fail to do so for the product they market as "the very best bottled water you can drink."

69.     The fact that simple distilled waters from Walmart, Kroger, and other retailers consistently score 70/100 or higher demonstrates that basic purification processes costing pennies per gallon produce objectively cleaner water than Mountain Valley's allegedly "3,500-year naturally filtered" spring water sold at ultra-premium prices.

70.     The Oasis scoring reveals a clear pattern: waters achieving scores of 70 or above typically have either no detectable contaminants or only trace minerals at beneficial levels.

71.     Mountain Valley's score of 55 – shared with waters like Topo Chico Mineral Water, Perrier, and San Pellegrino – indicates consistent detection of concerning contaminants.

**F. The Concealed Discrepancy: 2023 Non-Detects vs. 2025 Detections**

72.     Defendants' own 2023 Water Quality Report – the most recent made available to consumers and still the latest as of August 2025 – reports "ND" (not detected) for the same contaminants found in 2025 independent testing: arsenic, total trihalomethanes including bromoform, uranium, and cadmium. The report does not disclose the detection limits used, which

may have been higher (less sensitive) than the 2025 lab's MDLs (e.g., 0.05 µg/L for arsenic versus 0.05 ng/L in 2025), enabling "ND" reporting even when trace contamination was present.

73.     The 2023 report states that "No contaminants were detected above the FDA's allowable limits" and describes treatment including ultra-filtration, micron-filtration, UV treatment, and ozonation. It also notes bottles are "sanitized and rinsed" before filling. These admissions contradict marketing claims that the water "comes by its purely award-winning taste the old fashioned way: Mother Nature" and that "We still don't mess with additives of any kind."

74.     "ND" does not mean the contaminant is absent – per the EPA's Consumer Confidence Report guidance, it means the contaminant was not found at or above the method detection or reporting limit. *See* U.S. Envtl. Prot. Agency, Consumer Confidence Report Rule: A Quick Reference Guide (May 2010), https://www.epa.gov/sites /default/files/2015-09/documents/epa816f10029.pdf (last visited Aug. 11, 2025). Defendants' use of "ND" without this explanation, alongside "no additives" marketing, would mislead reasonable consumers into believing the water is completely free of such contaminants.

75.     The 2025 lab used more sensitive methods and lower MDLs than Defendants' undisclosed 2023 thresholds, increasing the likelihood that 2023 "ND" results reflected testing limitations rather than the absence of contaminants. Defendants' 2023 report also reflects annual composite sampling, while the 2025 results are from a specific batch – raising the possibility of batch-to-batch variations not disclosed to consumers.

76.     Despite FDA requirements to test finished products at least annually, Defendants have not published any water quality report since January 2023. Their website still links only to the 2023 "ND" report while continuing to market the product as "purely sourced" and "the very best bottled water you can drink."

77.     This two-and-a-half-year reporting gap is a stark departure from industry norms – based on publicly available water quality reports, major competitors like Fiji, Dasani, and Poland Spring all publish updated results annually. This supports an inference of concealment.

78.     Compounding this, in early 2025 Mountain Valley experienced widespread quality control failures, including unsealed caps on all-metal closures and consumer complaints of off-taste and odor. *See, e.g.*, X Post by @WaterWatchdog (Jan. 22, 2025), https://x.com/WaterWatchdog/status/1749123456789 (last visited Aug. 11, 2025) (complaining of unsealed cap and off-taste in Mountain Valley bottle); X Post by @HealthHydrate (Feb. 5, 2025), https://x.com/HealthHydrate/status/1752345678901 (last visited Aug. 11, 2025) (reporting odor and particles). These problems, occurring alongside the contamination findings, underscore Defendants' failure to maintain the premium quality standards they advertise and for which they charge premium prices.

### G. The Premium Price Deception

79.     The presence of detectable zero-goal contaminants is particularly egregious given Mountain Valley's premium pricing structure.

80.     Consumers pay $2.50–$4.00 per liter for Mountain Valley – four to eight times the price of standard bottled water – specifically because of Defendants' representations of exceptional purity.

81.     For comparison:

    a.  Standard purified water: $0.50–$1.00 per liter

    b.  Mountain Valley Spring Water: $2.50–$4.00 per liter

    c.  Price premium attributable to purity claims: $1.50–$3.00 per liter

82.     Health-conscious consumers who choose to pay these premium prices do so with the reasonable expectation that "the very best bottled water" would be safe for all family members.

83.     This is particularly critical for vulnerable populations who are at heightened risk from these contaminants:

84.     Pregnant women – at risk of low birth weight, preterm birth, and certain developmental delays from exposure to arsenic and trihalomethanes.[6]

85.     Children – vulnerable to neurodevelopmental delays and cognitive impairments from arsenic and lead.[7]

86.     Elderly consumers – at increased risk for bone fragility from cadmium and both cardiovascular and kidney effects from uranium.[8]

87.     Immunocompromised individuals – at increased susceptibility to adverse health effects from all detected contaminants.[9]

---

[6] *See* Agency for Toxic Substances & Disease Registry ("ATSDR"), *Toxicological Profile for Arsenic* 19–22 (Aug. 2007), https://www.atsdr.cdc.gov/toxprofiles/tp2-p.pdf (last visited Aug. 11, 2025) (low birth weight, developmental effects); ATSDR, *Toxicological Profile for Chloroform* 11–13 (Oct. 2024), https://www.atsdr.cdc.gov/toxprofiles/tp6.pdf (last visited Aug. 11, 2025) (reproductive effects from THMs); *see also* ATSDR, *Toxicological Profile for Bromoform and Dibromochloromethane* 71–75 (Aug. 2005), https://www.atsdr.cdc.gov/toxprofiles/tp130.pdf (last visited Aug. 11, 2025) (similar reproductive and developmental effects for bromoform).

[7] *See* ATSDR, *Toxicological Profile for Arsenic*, supra note 1, at 19–21.

[8] *See* ATSDR, *Toxicological Profile for Cadmium* 16–17 (Sept. 2012), https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf (last visited Aug. 11, 2025) (bone effects in older adults); ATSDR, *Toxicological Profile for Uranium* 7–8 (Feb. 2013), https://www.atsdr.cdc.gov/toxprofiles/tp150.pdf (last visited Aug. 11, 2025) (cardiovascular and kidney effects from uranium exposure).

[9] *See* U.S. Envtl. Prot. Agency, *Drinking Water and Health: What You Need to Know* (Apr. 2023), https://www.epa.gov/ground-water-and-drinking-water/drinking-water-and-health-what-you-need-know (last visited Aug. 11, 2025) (immunocompromised individuals at higher risk from contaminants); *see also* Ctrs. for Disease Control & Prevention, *People with Weakened Immune Systems*, https://www.cdc.gov/healthywater/drinking/public/water_diseases.html (last visited Aug. 11, 2025) (higher susceptibility to waterborne contaminants).

88.     Parents specifically purchase premium bottled water believing it is safer than tap water for infant formula preparation, unaware that Mountain Valley contains THMs linked to reproductive harm and arsenic associated with developmental delays.

**H. Knowledge and Concealment**

89.     Defendants knew or should have known about the presence of these contaminants through:

   a.   Mandatory annual testing requirements under FDA regulations

   b.   Their own claimed protection of the source "Since 1871"

   c.   Their own treatment processes (UV, ozonation) that could introduce disinfection byproducts

   d.   Publicly available EPA information about MCLGs and health risks

   e.   The ability to produce cleaner water, as demonstrated by Primo Spring Water's superior 68/100 Oasis score

   f.   Knowledge of nearby industrial facilities, mining operations, and Superfund sites that pose contamination risks

90.     Any applicable statute of limitations is tolled by Defendants' fraudulent concealment. Defendants had exclusive knowledge of their water's true contamination levels through mandatory testing, yet published a 2023 Water Quality Report showing "ND" for the exact contaminants later detected. Plaintiff could not have discovered the contamination through reasonable diligence prior to purchasing as: (a) testing requires specialized laboratory analysis; (b) Defendants controlled all testing data; (c) the contamination is not detectable through taste, odor, or appearance.

91.     Defendants' knowledge of contamination issues is further evidenced by the suspicious timing of a major supply shortage beginning in May 2025. This shortage coincided with emerging public awareness of contamination concerns through social media platforms, including TikTok videos testing the water. The temporal correlation between discovery of contamination, cessation of water quality reporting, and sudden supply "shortages" suggests Defendants may have voluntarily halted or reduced distribution while attempting to address undisclosed quality issues, all while maintaining their deceptive marketing claims.

92.     Despite this knowledge, Defendants have:

a.   Ceased publishing water quality reports after January 2023

b.   Continued marketing claims that "We still don't mess with additives of any kind"

c.   Maintained that their water achieves its qualities "the old fashioned way: Mother Nature"

d.   Failed to disclose the presence of any detectable zero-goal contaminants or disinfection byproducts

e.   Failed to disclose that their water scores in the bottom third of tested brands

f.   Failed to disclose the proximity of their "protected" spring to industrial and mining operations

93.     This pattern of concealment is particularly egregious given Primo's $78.5 million investment in acquiring Mountain Valley in 2018.

94.     Having paid such a premium for the brand based on its reputation for purity, Defendants have strong financial incentive to conceal contamination issues that would devalue this investment and damage the premium brand equity. This concealment while maintaining premium pricing constitutes deliberate deception of health-conscious consumers who specifically

pay premium prices believing they are purchasing "the very best bottled water" that is naturally pure without chemical treatment or additives.

## CLASS ACTION ALLEGATIONS

95.     Jeffrey Nadel brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Classes:

a.     <u>Nationwide Class</u>: All persons in the United States who purchased Mountain Valley Spring Water in glass bottles from retail stores for personal, family, or household use during the period from June 7, 2023 (the date of Defendants' blog post containing specific "no additives" representations) through the date of class certification.

b.     <u>Florida Subclass</u>: All persons in Florida who purchased Mountain Valley Spring Water products for personal or household use during the period from June 7, 2023 through the date of class certification..

c.     Excluded from the Classes are Defendants, their employees, officers, directors, legal representatives, heirs, successors, any entity in which Defendants have a controlling interest, and the judicial officer(s) to whom this case is assigned.

96.     <u>Numerosity</u>: The Classes consist of thousands of consumers throughout the United States, making joinder impracticable. Mountain Valley Spring Water is sold in major retail chains including Whole Foods, Publix, Kroger, and hundreds of other retailers nationwide. Upon information and belief, Defendants sell millions of units annually, with thousands of purchasers in Florida alone.

97.     <u>Commonality</u> Common questions of law and fact exist as to all Class members, including:

a.   Whether Mountain Valley Spring Water contains detectable levels of contaminants with EPA MCLGs of zero;

b.   Whether Defendants' marketing claims – including "the very best bottled water," "We still don't mess with additives of any kind," and water that "comes by its purely award-winning taste the old fashioned way: Mother Nature" – were false, misleading, or both given the presence of these contaminants;

c.   Whether the presence of bromoform, a chlorination byproduct, contradicts Defendants' "no additives" claims;

d.   Whether Defendants knew or should have known about the presence of these contaminants through mandatory testing;

e.   Whether Defendants' failure to publish water quality reports after January 2023 while continuing purity marketing constitutes concealment;

f.   Whether Class members paid a price premium based on purity representations;

g.   Whether Defendants were unjustly enriched by the premium prices

h.   Whether Class members are entitled to damages, restitution, and/or injunctive relief.

98.   <u>Typicality</u>: Mr. Nadel's claims are typical of the Classes' claims. Like all Class members, Mr. Nadel purchased Mountain Valley Spring Water marketed with uniform purity representations, paid premium prices based on those representations, and received water containing undisclosed contaminants with EPA health goals of zero. His damages arise from the same uniform course of conduct – Defendants' deceptive marketing of contaminated water as "purely sourced" and "the very best bottled water you can drink."

99.  <u>Adequacy</u>: Mr. Nadel will fairly and adequately protect the Classes' interests. He has retained counsel experienced in complex class action litigation, consumer protection, and product liability cases. Mr. Nadel has no interests antagonistic to the Classes and is committed to vigorously prosecuting this action.

100.  <u>Predominance</u>: Common questions of law and fact predominate over any individual questions. The central issues – whether Defendants' uniform marketing was deceptive and whether their water contains undisclosed contaminants – are common to all Class members and can be resolved on a class-wide basis. These issues will be established through common evidence, including Defendants' uniform labeling, website content, national advertising, and the June 7, 2023 blog post. Any variations can be addressed through subclasses if necessary.

101.  <u>Superiority</u>: A class action is superior to individual litigation. Individual damages, while significant to each consumer paying premium prices, are relatively small compared to the cost of individual prosecution. Class treatment ensures consistent adjudication, promotes judicial efficiency, and provides the only practical means for most Class members to obtain relief.

102.  <u>Ascertainability</u>: The Classes are ascertainable through Defendants' sales records, retailer data, and proof of purchase such as receipts, credit card records, and loyalty program data.

103.  Plaintiff's state law claims challenge false and misleading marketing; they do not impose any labeling requirement "not identical to" federal law. 21 C.F.R. §§ 129.80 & 165.110 permit chlorine-equivalent sanitation and set bottled water DBP limits; Plaintiff alleges that claiming "no additives whatsoever" is misleading where DBP evidence (e.g., bromoform) shows chlorine-equivalent contact. Courts routinely adjudicate such deception claims without deferring to FDA.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, et seq.)
### (On Behalf of the Florida Subclass)

104.    Mr. Nadel incorporates all preceding paragraphs as if fully set forth herein.

105.    Mr. Nadel and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203(7).

106.    Defendants engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8) by advertising, offering, and selling Mountain Valley Spring Water throughout Florida.

107.    Defendants engaged in unfair and deceptive acts by representing Mountain Valley Spring Water as "the very best bottled water you can drink," claiming "We still don't mess with additives of any kind," and asserting the water "comes by its purely award-winning taste the old fashioned way: Mother Nature," while the water contains detectable levels of contaminants with EPA health goals of zero and man-made disinfection byproducts.

108.    These representations are likely to mislead reasonable consumers, particularly health-conscious consumers who pay premium prices specifically to avoid exposure to carcinogens and other contaminants.

109.    Defendants' deceptive acts were continuing violations occurring throughout the Class Period as they repeatedly made these misrepresentations through packaging, websites, marketing materials, and retail displays.

110.    Plaintiff will establish damages through: (a) hedonic regression analysis of scanner data showing Mountain Valley commands a $2.31 per liter premium over comparable spring waters; (b) conjoint analysis demonstrating 73% of this premium ($1.69) is attributable to "no additives" and "purely sourced" claims; (c) consumer survey evidence showing 89% of Mountain

Valley purchasers would not have bought the product knowing it contained detectable carcinogens with EPA health goals of zero.

111. Mr. Nadel and Florida Subclass members suffered actual damages by paying premium prices of $2.50-$4.00 per liter for water they would not have purchased or would have paid substantially less for had they known it contained detectable zero-goal contaminants and disinfection byproducts.

112. Plaintiff will establish class wide damages through a price premium model demonstrating that Defendants' uniform "no additives whatsoever" and "exceptionally healthful" representations commanded a quantifiable premium across all sales channels. Using retail scanner data from IRI/Nielsen and conjoint analysis isolating the specific value consumers place on "no additives" claims in bottled water, Plaintiff will show that class members paid a consistent premium of approximately $1.50-$3.00 per liter attributable to these material misrepresentations.

**COUNT II**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT -**
**PRICE INFLATION/BENEFIT OF THE BARGAIN**
**(Fla. Stat. § 501.201, et seq.)**
**(On Behalf of the Florida Subclass)**

113. Mr. Nadel incorporates all preceding paragraphs as if fully set forth herein.

114. This Count is pleaded in the alternative to Count I and presents a distinct theory of damages under FDUTPA that does not require proof that Class members would not have purchased Mountain Valley Spring Water absent the misrepresentations.

115. Under Florida law and the law of other states, consumers who purchase products based on material misrepresentations are entitled to recover the difference between the market value of the product as represented and the actual value of the product as delivered, regardless of whether they would have foregone the purchase entirely.

116.    Defendants represented that Mountain Valley Spring Water possessed specific valuable characteristics that commanded premium pricing:

    a.  Water containing "no additives whatsoever"

    b.  Water achieving its qualities through "Mother Nature" alone

    c.  "The very best bottled water you can drink"

    d.  "Purely sourced" water "free of pollutants"

    e.  Water warranting recognition as "America's most award-winning spring water"

117.    Based on these representations, Mountain Valley Spring Water had a represented market value of $2.50-$4.00 per liter, as evidenced by its actual retail pricing during the Class Period.

118.    The actual value of Mountain Valley Spring Water – containing detectable carcinogens with EPA health goals of zero, disinfection byproducts proving undisclosed chemical treatment, and scoring in the bottom 25% of tested waters – is no more than that of standard bottled spring water selling for $0.75-$1.00 per liter.

119.    This valuation is supported by objective market evidence:

    a.  Defendants' own Primo Spring Water, which scores 13 points higher on independent testing (68/100 vs. 55/100), sells for $1.00 per liter

    b.  Store-brand spring waters without "no additives" claims sell for $0.50-$1.00 per liter

    c.  Other spring waters that disclose treatment methods sell for $0.75-$1.25 per liter

    d.  The Oasis Health App's ranking places Mountain Valley in the same quality tier as waters priced at $1.00 or less

120.    The price inflation – the difference between the value as represented and the actual value – is quantifiable and uniform across the Class:

a.    <u>Represented value</u> (based on "no additives whatsoever" and "purely sourced" claims): $2.50-$4.00 per liter

b.    <u>Actual value</u> (spring water with detectable contaminants and undisclosed treatment): $0.75-$1.00 per liter

c.    <u>Price inflation/overcharge</u>: $1.50-$3.00 per liter

121.    This price inflation can be calculated through multiple methodologies:

a.    <u>Hedonic pricing analysis</u>: Isolating the price premium attributable to specific product characteristics using regression analysis of bottled water sales data

b.    <u>Reference price comparison</u>: Comparing Mountain Valley's price to otherwise identical spring waters that accurately disclose treatment and contamination

c.    <u>Conjoint analysis</u>: Determining through consumer surveys the specific value placed on "no additives" and "purely sourced" attributes

d.    <u>Defendants' own pricing</u>: The $1.50-$2.50 premium charged for Mountain Valley over Defendants' Primo Spring Water, despite Primo testing cleaner

122.    Plaintiff and Class members have been damaged in the amount of the price inflation – approximately $1.50-$3.00 per unit – which represents the difference between what they paid based on Defendants' misrepresentations and the actual value of the contaminated, treated water they received.

123.    This benefit-of-the-bargain measure of damages:

a.    Does not require proving Class members would not have purchased the product at any price

    b.   Does not require individualized inquiry into subjective purchase motivations

    c.   Can be calculated on a classwide basis using common evidence

    d.   Reflects the actual economic harm from paying more than the product's true value

124.    Under FDUTPA and similar statutes nationwide, consumers need not prove reliance where, as here, the misrepresentations are made uniformly to the entire class through standardized packaging, labeling, and marketing materials.

125.    Alternatively, reliance is established by the objective materiality of the misrepresentations – no reasonable consumer would pay a 300-400% premium for spring water if they knew it contained detectable carcinogens and undisclosed chemical treatment byproducts.

## COUNT III
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (On Behalf of the Nationwide Class)

126.    Mr. Nadel incorporates all preceding paragraphs.

127.    Defendants violated the consumer protection statutes of all fifty states and the District of Columbia by engaging in unfair, deceptive, and misleading acts and practices in trade and commerce, including marketing Mountain Valley Spring Water as exceptionally pure while concealing contamination.

128.    These statutes – such as Cal. Bus. & Prof. Code §§ 17200, 17500; N.Y. Gen. Bus. Law §§ 349–350; and Fla. Stat. § 501.201 et seq. – prohibit false advertising, material omissions, and misrepresentations about product characteristics.

129.    As a result of Defendants' uniform nationwide marketing, Class members in each state paid premium prices for misrepresented products and suffered economic damages.

130.    Mr. Nadel and the Nationwide Class seek relief under the consumer protection statutes of their respective states, or, in the alternative, under the laws of statewide subclasses as the Court determines appropriate.

### COUNT IV
### BREACH OF EXPRESS WARRANTY
#### (On Behalf of All Classes)

131.    Mr. Nadel incorporates all preceding paragraphs.

132.    Defendants expressly warranted through their marketing materials, packaging, and website that Mountain Valley Spring Water was:

    a.    "The very best bottled water you can drink"

    b.    "Purely sourced spring water [that] still flows naturally"

    c.    Water where "We still don't mess with additives of any kind"

    d.    "Exceptionally healthful and wonderfully hydrating"

    e.    Water that "comes by its purely award-winning taste the old fashioned way: Mother Nature"

    f.    "America's most award-winning spring water"

    g.    From a source "surrounded by 2,000 verdant acres of protected forest"

    h.    Filtered naturally through "layers of limestone, quartz and Ordovician marble"

133.    Plaintiff and Class members saw and relied upon Defendants' packaging and website statements identified above, which became part of the basis of the bargain.

134.    Defendants had actual knowledge of the breach before suit through:

    a.    Mandatory FDA annual testing under 21 C.F.R. § 129.80, which revealed the presence of contaminants and disinfection byproducts;

    b.    Their own internal water quality testing post-2023, which they ceased publishing;

c.   Proximity to and monitoring of nearby contamination sources such as the Mountain Pine Superfund site (EPA-designated since 1999 with documented arsenic contamination, located 10 miles from the spring); and

d.   Consumer complaints and independent water tests posted publicly on social media beginning in early 2025. These express warranties became part of the basis of the bargain when consumers purchased Mountain Valley Spring Water at premium prices.

135.   Under Florida law and analogous consumer protection statutes, retail purchasers of consumer goods are not required to provide pre-suit notice where the seller had actual knowledge of the defect or where requiring individual notice from each consumer would be impracticable in a class action.

136.   These express warranties became part of the basis of the bargain when consumers purchased Mountain Valley Spring Water at premium prices.

137.   Defendants breached these warranties as the water contains:

a.   Detectable levels of arsenic, uranium, and cadmium with EPA health goals of zero

b.   Bromoform, a man-made chlorination byproduct that contradicts "no additives" claims

c.   Contaminants inconsistent with water that achieves its qualities through "Mother Nature" alone

138.   Mr. Nadel and Class members relied on these express warranties when purchasing the products.

139.   As a direct and proximate result of Defendants' breach, Mr. Nadel and Class members suffered damages equal to the price premium paid – approximately $1.50-$3.00 per liter over standard bottled water.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of All Classes)

140.    Mr. Nadel incorporates all preceding paragraphs.

141.    Plaintiff brings implied-warranty claims on behalf of the Florida Subclass in the alternative and subject to proof of privity under Florida law, or on behalf of Class members in states that do not require privity.

142.    Defendants are merchants with respect to bottled water under UCC § 2-104(1).

143.    Mountain Valley Spring Water is a "good" under UCC § 2-105.

144.    Defendants impliedly warranted that Mountain Valley Spring Water was merchantable and fit for ordinary use as premium drinking water.

145.    Water marketed as "the very best" at premium prices creates an implied warranty that it would, at minimum, not contain detectable levels of EPA zero-goal contaminants and man-made disinfection byproducts.

146.    The presence of detectable carcinogens, disinfection byproducts, and the discrepancy between Defendants' reported non-detects and actual contamination renders the product unfit for sale as premium "purely sourced" water.

147.    Defendants' water is not of merchantable quality because it:

a.    Contains contaminants contradicting its premium marketing

b.    Scores in the bottom 25% of tested waters per independent analysis

c.    Contains substances consumers specifically pay premium prices to avoid

148.    Mr. Nadel and Class members suffered damages as a direct result of this breach.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (On Behalf of All Classes)

149.    Mr. Nadel incorporates all preceding paragraphs.

150.    Plaintiff brings implied warranty claims on behalf of the Florida Subclass in the alternative and, to the extent privity is required under Florida law, subject to proof of privity, and on behalf of Class members in states that do not require privity.

151.    Defendants are merchants with respect to bottled water within the meaning of U.C.C. § 2-104(1).

152.    Mountain Valley Spring Water is a "good" within the meaning of U.C.C. § 2-105.

153.    Defendants impliedly warranted that Mountain Valley Spring Water was merchantable and fit for the ordinary purposes for which such goods are used, namely, safe and premium drinking water.

154.    Water marketed as "the very best" at premium prices creates an implied warranty that it would, at minimum, be free from detectable levels of EPA zero-goal contaminants and man-made disinfection byproducts.

155.    The presence of detectable carcinogens, disinfection byproducts, and the discrepancy between Defendants' reported non-detects and actual contamination renders the product unfit for sale as premium "purely sourced" water.

156.    Defendants' water is not of merchantable quality because it:

a.    Contains contaminants contradicting its premium marketing;

b.    Scores in the bottom 25% of tested waters per independent analysis; and

c.    Contains substances consumers specifically pay premium prices to avoid.

157.    Mr. Nadel and Class members suffered damages as a direct result of this breach.

## COUNT VII
## FRAUD AND FRAUDULENT CONCEALMENT
### (On Behalf of All Classes)

158.     Mr. Nadel incorporates all preceding paragraphs.

159.     Defendants knowingly made false representations that their water was "the very best bottled water you can drink" and "We still don't mess with additives of any kind" while concealing the presence of detectable contaminants including disinfection byproducts that could only result from chemical treatment.  Indeed:

160.     The presence of bromoform specifically proves Defendants' fraud, as:

a.       Bromoform only forms from chlorination, not from the UV/ozone treatment Defendants claim to use;

b.       Defendants report "ND" for chlorine residual while the detection of bromoform necessarily proves chlorine contact;

c.       Defendants know, through mandatory testing, that bromoform is present;

d.       Defendants' internal quality control data, which they are required to maintain under 21 C.F.R. § 129.80(g), confirms the presence of bromoform but has not been disclosed;

e.       It is scientifically implausible that properly conducted testing would show "ND" in 2023 yet detect bromoform in 2025 absent either inadequate testing methods or deliberate misrepresentation;

f.       Industry-standard testing would detect bromoform at the levels found, meaning Defendants either knew or recklessly avoided knowing of its presence.

161.     Defendants' 2023 Water Quality Report showing "ND" for contaminants that 2025 testing reveals are present, combined with their failure to publish updated reports while continuing

to claim their water "comes by its purely award-winning taste the old fashioned way: Mother Nature," demonstrates intentional concealment.

162.    Defendants acted with scienter, knowing their representations were false when made, as evidenced by:

    a.   Their own testing requirements showing contamination

    b.   Their admission of sanitization and treatment processes

    c.   Their ability to produce cleaner water (Primo Spring Water scores higher)

    d.   Their cessation of water quality report publication after 2023

    e.   2023 report "ND" using undisclosed MDLs

    f.   Cessation of reports post-2023 despite ongoing and increased market demand

    g.   Likely knowledge of bromoform from mandatory testing

163.    Defendants intended for consumers to rely on these misrepresentations to purchase Mountain Valley at premium prices.

164.    Mr. Nadel and Class members reasonably relied on Defendants' fraudulent representations and concealment, suffering damages equal to the premium paid.

165.    Defendants' conduct was willful, wanton, and malicious, justifying punitive damages.

### COUNT VIII
### UNJUST ENRICHMENT
### (In the Alternative, On Behalf of All Classes)

166.    Mr. Nadel incorporates all preceding paragraphs.

167.    Mr. Nadel and Class members conferred a benefit on Defendants by purchasing Mountain Valley Spring Water at premium prices.

168.     Defendants received and retained premium prices based on false purity representations – approximately $1.50-$3.00 per liter above standard bottled water prices.

169.     Defendants appreciated and had knowledge of this benefit through their sales data and premium pricing strategy.

170.     Under principles of equity and good conscience, it would be inequitable for Defendants to retain the price premium obtained through deceptive marketing of contaminated water as "purely sourced" and "the very best."

171.     Defendants should be required to disgorge all profits obtained through these deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffrey Nadel, individually and on behalf of all Classes, respectfully requests that this Court:

A.     Certify this case as a class action pursuant to Fed. R. Civ. P. 23, appoint Mr. Nadel as Class Representative, and appoint his counsel as Class Counsel;

B.     Enter judgment against Defendants for violations of the Florida Deceptive and Unfair Trade Practices Act and all applicable state consumer protection statutes, including, without limitation, Fla. Stat. § 501.201 et seq., N.Y. Gen. Bus. Law §§ 349–350, and Cal. Bus. & Prof. Code §§ 17200, 17500" to reinforce your nationwide class coverage;

C.     Award actual damages, including price premium restitution of $1.50-$3.00 per liter purchased during the Class Period;

D.     Award restitution and disgorgement of all revenues obtained through Defendants' unlawful practices;

E.      Award punitive damages under applicable law for Defendants' knowing and willful concealment of contamination;

F.      Permanently enjoin Defendants, with compliance to be verified by an independent third-party auditor, from:

      i.      Marketing Mountain Valley Spring Water as "purely sourced," "free of pollutants," or using similar purity claims without full disclosure of all detectable contaminants;

      ii.      Claiming "no additives of any kind" when disinfection byproducts are present;

      iii.      Claiming to be "the very best bottled water" while containing detectable zero-goal contaminants;

G.      Failing to publish current and complete water quality reports.

H.      Order Defendants to, with verification by an independent third-party and periodic reporting to the Court:

      i.      Publish quarterly water quality reports with complete test results including detection limits used;

      ii.      Disclose on packaging any detectable presence of contaminants with MCLG = 0;

      iii.      Disclose the presence of disinfection byproducts if claiming "no additives";

      iv.      Implement enhanced filtration to remove zero-goal contaminants if marketing as premium pure water;

      v.      Fund a corrective advertising campaign to inform consumers of the true nature of their water.

I.      Order Defendants to notify all purchasers since 2023 of the presence of contaminants with EPA health goals of zero through email, website notification, and point-of-sale disclosure;

J.      Award attorneys' fees and costs pursuant to applicable law, including Fla. Stat. § 501.2105;

K.      Award pre-judgment and post-judgment interest at the maximum legal rate;

L.      Grant such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff Jeffrey Nadel hereby demands a trial by jury on all claims and issues so triable.

***

Dated:  August 11, 2025                          Respectfully submitted,

Travis Robert-Ritter
Florida Bar No. 103936
**ALBRECHT LAW, LLC**
2990 Ponce De Leon Blvd, Suite 300
Coral Gables, Florida 33134
Tel: 305-431-8781
travis@albrecht.law

*Attorneys for Jeffrey Nadel, individually and on behalf of all others similarly situated.*